### COOK v. STERLING ELECTRIC CO.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1907.)

No. 1,291.

1. PATENTS—PAROL LICENSE—VALIDITY.

A parol license under a patent may be sustained and specifically enforced as between the parties.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 300.]

2. EVIDENCE—PAROL EVIDENCE—CONTRACTS—FRAUD AND MISTAKE.

While, as a general rule, a parol contract reduced to writing is to be held as fully expressed in the writing, this does not exclude a court of equity from inquiring whether through fraud, mistake, or inadvertence the writing fails to express the agreement, nor from giving effect to the oral agreement where such fraud, mistake, or inadvertence appears.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, §§ 1990–2020.]

3. CORPORATIONS—CONTRACT IN CONTEMPLATION OF INCORPORATION.

An agreement entered into in contemplation of incorporation and followed by incorporation is binding upon the parties, and will be enforced in its entirety where all except one of the terms of the contract have been executed, and such term has failed of execution solely through fraud, mistake, or inadvertence of the parties.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 97–100.]

Appeal from the Circuit Court of the United States for the District of Indiana.

For opinion below, see 118 Fed. 45.

The bill was to restrain the infringement of letters patent No. 641,373, issued Jan. 16th, 1900, to Frank B. Cook, for a new and useful improvement in telephone switch boards—the defense being by way of plea that prior to any of the acts complained of in the bill, and prior to the issuance of the patent, the appellant made with appellee an oral agreement, whereby it granted to appellee, and to its officers and directors, in its behalf, the exclusive right to make, use and sell, and to license others to make, use, and sell, various improvements, among which was the improvement in telephone switch boards covered by the patent in suit, such license to run throughout the United States, and for the full term of the life of the patent.

The license pleaded covered not only the patent in suit, but ten other patents then issued, and applications then pending in the patent office—the patent sued upon being then in the form of an application upon which a patent was subsequently issued. At the time the suit was brought, nine other suits were brought upon the other patents referred to; it being stipulated that these nine suits should be determined according to the decree entered in the suit under consideration. In the Circuit Court the bill was dismissed. The further facts, necessary to the determination of this cause, are stated in the opinion.

Keene H. Addington, for appellant.

John F. McHugh, for appellee.

Before GROSSCUP, SEAMAN, and KOHLSAAT, Circuit Judges.

GROSSCUP, Circuit Judge. Appellant is an electrical engineer and inventor, and prior to 1898 was in the employ of the Central Union Telephone Company, which employ he left in the year 1898, to engage in the business of manufacturing electrical machinery, devices and appliances. This he did through a corporation known as the Sterling Electric Company, of Illinois, two-thirds of whose stock was owned by him, and one-third by one Walter E. Doolittle—a corporation that in February, 1898, began to manufacture and sell electrical machinery, appliances, devices, and apparatus, used especially in operating telephonic systems.

February 23rd, 1898, there was executed by appellant to the Sterling Electric Company of Illinois, a written license covering the inventions of appellant in telephonic apparatus, some of which inventions had matured already into patents, and others were pending on application (but not covering the patent in suit, application for which had just been made) which license granted to the Sterling Company the exclusive right to manufacture, sell and use, the inventions thus named.

The business of the Sterling Electric Company of Illinois seems to have grown rapidly—so rapidly, indeed, that for the purpose of getting a working capital to take care of its increasing business, negotiations

were opened up between Cook and Doolittle, on the one side, and the Commercial Club of Lafayette, on the other, looking toward the removal of the plant from Chicago to Lafayette. Some matters connected with these negotiations are admitted. It is admitted, for instance, that the negotiation contemplated that the property of the Illinois corporation should be taken over by an Indiana corporation of the same name, having a capital stock of one hundred thousand dollars; that the property thus taken over should include all the property, plant and assets of the Illinois corporation (except bills receivable and book accounts), as also a license from appellant of the right to manufacture, use and sell, certain telephone machinery, devices, apparatus and appliances covered by his inventions (the extent of this license being the thing in dispute); that to Cook and his wife and Doolittle should be issued seventy-five thousand dollars par value of the Indiana corporation, fully paid and non-assessable, and the other twenty-five thousand to be subscribed and paid for in cash by certain citizens of Lafayette; that of this seventy-five thousand issued to Cook and his associates, fifteen thousand should be bought from him at par, in cash, by citizens of Lafayette; and that all of these stipulations, except the disputed one relating to the license, were fully carried out in the removal that took place.

The terms of the transfer having been agreed upon between the Commercial Club of Lafayette and Cook and his associates, and the Indiana corporation having been organized, Cook and his associates formally proposed, and the appellee by resolution of its directors formally accepted, the exclusive right and license to manufacture and sell certain inventions, some of them covered by letters patent already issued, others by application pending, at the valuation of thirty thousand dollars—the balance of the property having been put in at forty-five thousand dollars—for which the seventy-five thousand dollars par value of stock was formally issued. The inventions thus named, however, in this formal proposal and acceptance, did not specifically include the one in suit. The contention of Cook, so far as there is dispute as to the facts of the case, is that this formal proposal and acceptance was intended to cover the whole of his contract obligation with the committee of the Commercial Club; the contention of the appellee being that Cook purposely omitted from this proposal the invention included in this suit, as also other inventions then pending on application in the patent office, and that the directors, relying upon Cook's superior knowledge of what inventions he possessed, and his intention in good faith to carry out the preliminary agreement, inadvertently accepted the formal proposal, and thereupon issued the stock.

A careful examination of the record, keeping in view the entire setting of the transaction, as well as the specific facts testified to, convinces us that whatever Cook secretly intended, the committee from Lafayette was led by him to believe that the company to be organized would acquire a license to manufacture, use and sell, not only under the patents and applications mentioned in Cook's subsequent formal proposal to the board of directors, but all patents and applications pertaining to the operation of telephonic systems; and that the board of directors

was led by Cook to believe, that in accepting his formal proposal, and issuing his stock, the company was obtaining the patent in suit as a part of what the committee believed that it had contracted for. To go into an elaboration of the reasons for this conclusion would be a useless waste of space. It is the conclusion to which the master came after hearing the witnesses, and carefully reviewing the testimony. It was the conclusion of the judge reviewing the master. It is embodied clearly and consciously in the sworn testimony of the members of the committee who negotiated with Cook in the conference that led to the consummation of the transaction. The denial of Cook is in many respects entirely unsatisfactory. And it would be difficult to conceive that intelligent men who, in the spirit of a public interest, contemplated bringing to their town a new industry, supplementing their public spirit by embarking a substantial sum of their own money in the venture, would omit from the calculation an element so essential to the success of the enterprise. To hold otherwise, would be to credit to the cunning of appellant a success, and to the committee that dealt with him a stupidity, that the care shown in all the other branches of the negotiation clearly discredit.

The disputed fact of the case thus determined, the question remains whether the finding avails the defense interposed by appellee. The principal contentions of the appellant on this question are: That the parol negotiations, whatever they were, were merged in the written proposal and acceptance; that the parol negotiations, having been conducted by a voluntary committee, did not become a contract, because there was no corporation then organized—no principal behind the committee; and that the license, constituting as it does an assignment, could not be made except in writing.

The contentions are not applicable to the case under consideration. True, as to the world at large, an assignment is not good unless put in writing and recorded; but as between parties to the transaction, a license by parol may be sustained, and enforced, if need be, by a decree for specific performance. True, also, as a general rule, a parol contract reduced to writing, is to be held as fully expressed in the writing. But this does not exclude a court of equity from the inquiry whether, by fraud, mistake, or inadvertence, the writing fails to express the agreement; or (such fraud, mistake, or inadvertence appearing) from giving force to the oral agreement. Nor is it true that an arrangement entered into, in contemplation of incorporation, and followed by incorporation, is not binding upon the parties, when all the terms of the contract except the one in dispute have been fully and in good faith executed, and the disputed term fails of execution solely through the fraud, mistake, or inadvertence of the parties. To hold, in this respect, as we are asked to hold, would be to make all agreements preliminary to incorporation of no avail, notwithstanding the completion of the transaction by incorporation—a doctrine that in the present development of the law has no standing whatever.

For the reasons stated, the decree of the Circuit Court is affirmed.